Norman M. Semanko (ISB #4761)
PARSONS BEHLE & LATIMER
800 W. Main Street, Suite 1300
Boise, ID  83702
Telephone: (208) 562-4900
Facsimile:  (208) 562-4901
NSemanko@parsonsbehle.com

Lawrence A. Kogan
THE KOGAN LAW GROUP, P.C.
(NY # 2172955; *Pro Hac Application Pending*)
100 United Nations Plaza, Suite #14F
New York, NY 10017
(212) 644-9240
lkogan@koganlawgroup.com

Attorneys for Ace Black Ranches, LLP

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ACE BLACK RANCHES, LLC,<br><br>                              Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; EPA Administrator MICHAEL REGAN, in his official capacity; Acting EPA Region 10 Administrator MICHELLE PIRZADEH in her official capacity; UNITED STATES ARMY CORPS OF ENGINEERS; SCOTT SPELLMON, Chief of Engineers, U.S. Army Corps, in his official capacity; RICK CHILDERS, District Engineer, Walla Walla District, U.S. Army Corps, in his official capacity,<br><br>                              Defendants. | Case No.   1:21-cv-214<br><br>**COMPLAINT** |

**COMPLAINT - 1**
30417.001\4850-0816-5866.v3

Plaintiff Ace Black Ranches, LLP, by and through their counsel, states as follows for its Complaint against the above-named Defendants.

## NATURE OF ACTION

1.      This Clean Water Act ("CWA") pre-enforcement action seeks immediate injunctive and declaratory relief, prior to Defendants' scheduled May 18-20, 2021 inspection of Plaintiff's ranch, to ensure the protection of Plaintiff's and its owners' and employees' constitutional right not to have their ranch property, ranching operations, and ranching operation books and records located in Bruneau, Idaho, subjected to an unreasonable search and seizure by the Defendant United States Environmental Protection Agency ( "Defendant EPA"), the Defendant U.S. Army Corps of Engineers ( "Defendant Corps"), and their respective representatives and consultants, in violation of the Fourth Amendment to the United States Constitution.

2.      This CWA pre-enforcement action also seeks immediate injunctive and declaratory relief, prior to Defendants' scheduled May 18-20, 2021 inspection of Plaintiff's approximately 800-acre ranch, to ensure the protection of the Plaintiff's and its owners' and employees' constitutional right not to be deprived of life, liberty, or property without being afforded procedural due process of law by these Defendant agencies and their representatives and consultants, consistent with the Fifth and Fourteenth Amendments to the United States Constitution.

3.      The Defendant agencies issued to the Plaintiff, including its owners and employees, CWA "potential violation" / "potential unauthorized activity" letters, which were intended to notify the Plaintiff of its potential CWA violation(s) / potential unauthorized activities and the penalties that would be incurred for noncompliance.  These letters were drafted in a way that would avoid being characterized as a "compliance order" amounting to a "final agency action" under the Administrative Procedure Act (5 U.S.C. § 551, et seq.), and implicating judicial view, as had the

**COMPLAINT - 2**
30417.001\4850-0816-5866.v3

compliance order the U.S. Supreme Court found to be a judicially reviewable final agency action in *Sackett v. Envt'l Prot. Agency*, 566 U.S. 120 (2012).[1]

4.      Following their issuance of these questionable letters (or orders?) which advised the Plaintiff "not to perform any work requiring [Corps] authorization and sought a prodigious amount of information, the Defendant EPA Region 10 (or "Defendant EPA") and the Defendant Corps insisted in separate correspondences that the Plaintiff and its representatives grant consent to said agencies' "requested" onsite inspection of Plaintiff's approximately 800-acre ranch within the month of May 2021.  The Plaintiff and its owners and employees, under advice from their counsel and wetland consultants, have been amenable to such demand, and have consented to scheduling such an inspection for the three-day period spanning from May 18, 2021 thru May 20, 2021, on the condition that the Defendant agencies provide the Plaintiff and its owners and employees with information sufficient to enable them to identify the specific areas where they have allegedly committed potential CWA violations (i.e., to understand the legal bases/grounds for the Defendants agencies' allegations that Plaintiff committed potential CWA violations).

5.      The Defendant agencies, however, have refused to provide the Plaintiff and its owners and employees with sufficient photographic, mapping, or other information and data that could possibly enable them to identify the specific potential violation areas on their approximately 800-acre ranch, and to understand the legal bases/grounds for their allegations of potential

---

[1] In *Sackett*, the Court held that, "there is no reason to think that the Clean Water Act was uniquely designed to enable the strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review – even judicial review of the question whether the regulated party is within EPA's jurisdiction. Compliance orders will remain an effective means of securing prompt voluntary compliance in those many cases where there is no substantial basis to question their validity." 566 U.S. at 130–131.  *See also* Mike Crapo, *Senators Urge EPA to Heed Supreme Court Decision – Ask For Explanation of Ruling's Impact on Clean Water Act Enforcement*, News Release (May 31, 2012).

violations.   The Defendant agencies have disregarded not only Plaintiff's several informal correspondence-based requests to provide such information, but they also have insufficiently responded to Plaintiff's formal Freedom of Information Act ("FOIA") requests, prior to the scheduled three-day May 18–20, 2021 inspection to which the Plaintiff willingly consented.

6.      As the result, the Plaintiff and its owners and employees have been intentionally left uninformed and rendered unable by the Defendant agencies to identify their ranch's specific potential violation areas and activities which the Government expects to inspect and evaluate from May 18 to 20, 2021.  Consequently, the Plaintiff and its owners and employees have thereby been denied their constitutional right to develop an adequate legal defense to this joint agency administrative investigation and to the CWA enforcement action replete with penalties that will likely follow.   Since the Defendant agencies, as of this filing, have provided only general information about a 383-acre area of interest, and no specific information identifying the specific areas of Plaintiff's alleged potential CWA violations, the Plaintiff has withdrawn the consent it previously granted for the Defendant agencies to enter its properties on May 18–20, 2021.

## JURISDICTION

7.      This Court has original subject matter federal question jurisdiction over this claim pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and the laws of the United States, including the Fourth and Fifth Amendments to the United States Constitution, and applicable jurisprudence.   This Court also may grant injunctive, declaratory, and restorative relief under 28 U.S.C. §§ 2201-2202, 5  U.S.C.§§  705–706, and Fed. R. Civ. P. 57 and 65.

8.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(2)-(c)(2) and (e)(1), because Defendants are United States agencies or officers sued in their official capacities, the Defendant Corps' local regulatory office is physically located in this District, and Defendant

EPA's Region 10 Office has jurisdiction over this District, and because a substantial part of the Plaintiffs' property that is the subject of the action on which a substantial part of the events or omissions giving rise to the claim are alleged to have occurred, and the Plaintiff conducts business in this District.

## PARTIES

9.      The Plaintiff ACE BLACK RANCHES, LLP is an Idaho limited liability partnership, the principal place of business of which is located at 28892 Hot Springs Road, Bruneau, Idaho, 83604.  Plaintiff owns a 100 percent interest in the properties used in its ranching operations some of which are currently subject to Defendants' current information request and demand for an immediate onsite inspection.  Plaintiff has two limited partners: Terry Black, the managing partner, and Anthony Black, each of whom holds an equal 50% interest in Plaintiff, and both of whom are resident and domiciled in Idaho.  Plaintiff's key employee is Telby Black.

10.      The Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA") is a cabinet agency charged with the administration and enforcement of the CWA, and specifically with approving or disapproving permits for and monitoring compliance of entities regulated under Section 402 of the CWA pursuant to the National Pollutant Discharge Elimination System ("NPDES").  EPA also is responsible for approving and overseeing State assumption of Section 404 permitting authority; possesses the authority to prohibit, deny, or restrict approval of a Section 404 permit; and develops policy guidance and environmental criteria used in evaluating permit applications and in determining the scope of geographic jurisdiction.

11.      The Defendant UNITED STATES ARMY CORPS OF ENGINEERS ("Corps") is a branch of the Department of the Army of the Department of Defense.  The Corps is charged with regulating the permitting of discharges of dredged or fill material into "waters of the United

States," within the meaning of Section 404 of the CWA, has enforcement responsibility for Section 404 of the CWA affected by the "waters of the United States" definition, and it is also responsible for issuing jurisdictional determinations to help implement the Section 404 program by specifying what geographic areas will be treated as subject to regulation by the Corps under the CWA.

## STANDING

12.     Defendant Corps has accused the Plaintiff and its owners and employees of having committed potential violations of Section 404 of the CWA.  The Defendant Corps also has threatened the Plaintiff with administrative enforcement and/or civil and criminal prosecution if the Plaintiff fails to timely respond to its February 10, 2021 information questionnaire and/or to grant the Defendant Corps immediate and unconditional entry onto the Plaintiff's approximate 800-acre ranch to conduct an onsite investigation/inspection to determine whether the agency has jurisdiction under the CWA.  The Defendant Corps, however, has failed, and effectively refused, to provide to the Plaintiff and its representatives any photographic, mapping, or other information or data, through informal communications with them, or through the formal FOIA request process, that could enable them to identify those of the Plaintiff's farming and other activities that could have potentially violated CWA Sections 404 and/or 402, prior to the conditionally scheduled onsite visit.  The Defendant Corps has done so by referring its gathered and reviewed FOIA response information to the Defendant EPA Region 10 for a disclosure determination.

13.     The Defendant EPA Region 10, which has assumed lead enforcement agency status in the Defendant agencies' joint investigation of the Plaintiff's ranching and other operations, has accused the Plaintiff and its owners and employees of having committed "potential violations": (1) of Section 404 the CWA involving the allegedly unauthorized discharge of dredged and/or fill material into the Bruneau River, its tributaries, and adjacent wetlands located in Owyhee County,

Idaho without a permit; and (2) of Section 402 of the CWA involving alleged discharges from Plaintiff's ranch "facility," serving as a "point source," without the authorization provided by a National Pollutant Discharge Elimination System ("NPEDES") permit. In addition, the Defendant EPA Region 10 has threatened the Plaintiff and its owners and employees with administrative enforcement, and/or civil and criminal prosecution if they fail to timely respond to its CWA Section 308 Information Request and/or to grant the Defendant EPA immediate entry onto their approximate 800-acre ranch to conduct an onsite investigation/inspection to determine whether the Defendant EPA has jurisdiction under the CWA. Although the Plaintiff has conditionally scheduled the requested onsite inspection for May 18–20, 2021, the Defendant EPA Region 10 has failed, if not refused, to provide to the Plaintiff and its representatives, before said onsite visit, any photographic, mapping, or other information that could enable them to identify those of the Plaintiff's farming and other activities that the Defendant agencies allege potentially violated CWA Sections 404 and/or 402.

14.     As the result of these Defendant Corps and Defendant EPA acts, the Plaintiff and its owners and employees have been denied their constitutional right against an unreasonable search and seizure(s) in violation of the Fourth Amendment; they have been unfairly denied the ability to exercise their protectible rights and liberty interests to develop and an adequate legal defense against these allegations and to operate their ranch to make a living free from undue governmental interference; and they have unfairly been denied the federal procedures to ensure them an adequate opportunity to be heard in violation of the Fifth Amendment's Due Process

Clause. Unless this court provides the immediate injunctive and declaratory relief requested, these deprivations are likely to continue.[2]

15.     Notwithstanding the express threat of being subject by both Defendant agencies to a CWA enforcement action and the imposition of significant civil penalties under CWA Section 309 for violating the CWA Section 308 Information Request and inspection demand, the Plaintiff and its owners and employees seek to protect their constitutional rights by filing this action.  Upon filing this action for immediate injunctive and declaratory relief, the Plaintiff will deny the Defendant agencies entry upon their approximately 800-acre ranch for the purpose of conducting an inspection to determine whether the Plaintiff's ranching activities actually violated the CWA, and will withhold responses to the Defendant EPA's CWA Section 308 Information Requests, unless and until the Defendant agencies provide the Plaintiff and its representatives, through the FOIA process, with photographic, mapping, or other information or data that would enable them to identify those of the Plaintiff's farming and other operations and activities that could have potentially violated CWA Sections 404 and/or 402.

16.     The Plaintiff and its owners and employees have standing under Article III because they already have suffered a concrete injury-in-fact having been compelled to retain costly counsel and technical consultants for the purpose of responding to the Defendant agencies' CWA violation allegations and impending investigation/inspection, and they will likely suffer further imminent injury as the result of the Defendant agencies' ongoing investigations/inspections and certainly impending forthcoming enforcement actions, and it is likely that such extant and impending injury-

---

[2] The Defendant EPA's May 7, 2021 expressly indicates that the scheduled May 18–20, 2021 onsite inspection to which the Plaintiff consented only on the condition, is only the first of an undisclosed number of inspections of the Plaintiff's properties the Defendant agencies will prospectively seek to conduct.

in-fact will be redressed by a favorable decision rendered by this Court.  The U.S. Supreme Court and other federal courts, including those in the Ninth Circuit, have held that pre-enforcement standing exists under Article III where the enforcement of a statute conflicts with a constitutional right (including both Fourth and Fifth Amendment claims) and there is a credible threat of prosecution for the violation of that statute, such that a plaintiff should not be required to undergo the prosecution as the sole means of seeking relief. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 134 S.Ct. 2334, 2342 (2014) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129 (2007), and *Babbit v. Farm Workers*, 442 U.S. 289, 298 (1979)).  *See* accord *United States v. Szabo*, 760 F.3d 997, 1006-1007 (9th Cir. 2014) (citing *Driehaus*, 134 S.Ct. at 2342–46); *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp. 3d 1063, 1081 (E.D. Calif. 2020) (citing and quoting *Driehaus*, 134 S.Ct. at 2341, and *Babbitt*, 442 U.S. at 298).

## **FACTUAL BACKGROUND**

***The February 10, 2021 Defendant Agency Potential Violation Letters and Information Requests Provided No Photographic and Other Information or Map Imagery or Data Supporting the Bases Underlying Defendant Agencies' "Potential Violation" Investigation***

17. On February 10, 2021, Plaintiff and its managing partner, Terry Black, received a return receipt requested hand-signed letter correspondence entitled, "Subject: NWW-2021-00077, Ace Black Ranch-Bruneau *River* Dredge and Fill."  Said letter was issued by Kelly J. Urbanek, Chief, Regulatory Division, of the Boise Regulatory Office of the Defendant Corps, Walla Walla District.

18. Defendant Corps' February 10, 2021 letter stated that, "[**i]t has come to the attention of** the […] (Corps) that you, or persons acting for you, **may have discharged** dredged or fill material below the ordinary high water mark (OHWM) of the Bruneau River, and **in sloughs**

**and wetlands adjacent to the Bruneau River**," and it provided the approximate coordinates conveying the location of a portion of Plaintiff's property. (Emphasis added.)  This letter, however, was unaccompanied by any map imagery or other illustration identifying the specific physical areas of interest/areas of concern.

19.     The Defendant Corps' February 10, 2021 letter also stated that, "[b]ased on our initial review, we have made a preliminary determination that the Bruneau River, the sloughs, and the adjacent wetlands where work is alleged to have occurred **may be** waters of the United States (WOTUS)." (Emphasis added.)    In addition, it stated that "no Department of the Army (DA) permit has been issued for this alleged activity"; that CWA Section 404 "requires that a DA permit be obtained for the discharge of dredged and/or fill material into WOTUS, including jurisdictional wetlands"; that CWA Section 301 "prohibits discharges of dredged or fill material into WOTUS unless the work has been authorized by a Department of the Army permit"; that "[p]ersons violating Section 301 are subject to administrative, civil, and criminal penalties under [CWA] Section 309"; and that, "[u]nder the CWA, restoration of the site to its pre-violation condition **may also** be required." (Emphasis added.)

20.     Beyond setting forth allegations of Plaintiff's potential violations of the wetland dredge and/or fill permitting provisions of CWA Section 404, the potential penalties that may be imposed for such violations, and the potential obligation to restore the site to its pre-violation condition, the Defendant Corps' February 10, 2021 letter, furthermore, advised the Plaintiff and its managing partner to stop performing all work requiring DA authorization without first obtaining that authorization.

21.     Moreover, the Defendant Corps' February 10, 2021 letter indicated that, "[a]n investigation will be conducted to determine whether a [CWA Section 301] violation occurred,"

"the extent of that violation" and "any mitigating factors," "and the appropriate resolution."   It then requested that the Plaintiff and its managing partner submit written answers to four questions, some with subparts, to assist the Corps in its investigation, and stated that the written responses "must be submitted by 12 March 2021," barely 30 days later.

22.     Finally, the Defendant Corps' February 10, 2021 letter stated that "[t]he Corps is currently in communication with Region 10 of the U.S. Environmental Protection Agency regarding this case," which was provided a copy of said letter, and it warned that, pursuant to the memorandum of agreement between the agencies regarding the coordination of CWA Section 404 enforcement actions, "this case may be partially or wholly transferred to the EPA for further action."   Said letter also indicated that the Corps was "furnishing copies of this letter to Telby Black with Ace Black Ranches, LLP; the EPA; the Idaho Department of Fish and Game; the Idaho Department of Lands; the Idaho Department of Environmental Quality; and the Idaho Department of Water Resources."

23.     On February 10, 2021, the Plaintiff, and its managing partner, Terry Black, received a return receipt requested electronically signed letter correspondence entitled, "INFORMATION REQUEST for Ace Black Ranches, LLP – Bruneau, Idaho."   Said letter was issued by Jeffery Kenknight, Chief Water Enforcement and Field Branch, of the Defendant United States Environmental Protection Agency Region 10 Seattle, Washington Office.

24.     The Defendant EPA's February 10, 2021 letter stated that EPA Region 10 "is seeking information regarding the property located at" the Plaintiff's mailing address, which it designated as a "('Facility') owned or operated by Ace Black Ranches, LLP ('Respondent')."   Said letter indicated that "[t]he enclosed Information Request is being issued […] pursuant to Section 308 of [the CWA]."

25.     The Defendant EPA's February 10, 2021 letter indicated that the agency "has been **notified of** alleged violations of the CWA involving the unauthorized discharge of dredged and/or fill material into the Bruneau River, sloughs/**tributaries to the Bruneau River**, and wetlands adjacent to the Bruneau River and its sloughs/**tributaries in Owyhee County, Idaho**." (Emphasis added.)  Said letter also indicated that "[t]he [Corps'] records do not identify a permit issued under CWA Section 404 […] or an application for this work activity."  This general written description of the area of interest indicated that it was larger than the area of interest the Defendant Corps had identified in its February 10, 2021 letter.  However, like the Corps letter, it was unaccompanied by any supporting information or map imagery that would enable the Plaintiff to identify specific physical areas of interest and the bases underlying the Defendant agencies' investigation.

26.     In addition, the Defendant EPA's February 10, 2021 letter stated that "EPA is also aware of other potential discharges from the Facility without authorization by a National Pollutant Discharge Elimination System (NPDES) permit issued pursuant to CWA Section 402…"  EPA is seeking information related to these alleged CWA [404 and 402] violations at the Facility."  Said letter did not mention the term or otherwise identify, in any way, that any such alleged discharge had been made from a "point source" at the Plaintiff's Facility/Site.

27.     The Defendant EPA's February 10, 2021 letter also informed the Plaintiff and its managing partner of EPA's authorization, pursuant to CWA Section 308, "to require the submission of records, reports and other information for the purpose of determining whether any violations of the CWA have occurred and to carry out any other provisions of the CWA.  Said letter then stated in bolded print that: "**Respondent is required to provide information and documents in accordance with the enclosed Information Request (Enclosure 1) within 30 days of your receipt of this request.**" (Boldfaced emphasis in original.)

28.     The Defendant EPA's February 10, 2021 letter, in addition, stated that, "[p]lease ensure the Statement of Certification (Enclosure 2) is signed by you or a duly authorized officer or agent of Respondent and returned with the response to this Information Request."  Enclosure 2 required the Respondent **to certify** *inter alia* "**that the information provided is true, accurate, and complete**." (Emphasis added.)

29.     Defendant EPA's February 10, 2021 letter, furthermore, stated that "[f]ailure to **respond fully and truthfully** to this Information Request in a timely manner **may subject you to an enforcement action** for civil penalties pursuant to Section 309 of the CWA … In addition, provision of false, fictitious, or fraudulent statements or representations may subject you to criminal penalties under 18 U.S.C. § 1001." (Emphasis added.)   Moreover, said letter stated that, "[t]he information provided in response to this Information Request may be used by EPA in administrative, civil, or criminal proceedings."

30.     Defendant EPA's Information Request to which the EPA's February 10, 2021 letter referred as "Enclosure 1," defined the terms "you" and "Respondent" as including Plaintiff "Ace Black Ranches, LLP, and its subsidiaries, officers, directors, managers, partners, employees, contractors, and agents."   Said Information Request defined the term "Facility" as the property owned or operated by Respondent, including seven distinct parcel numbers located at the Plaintiff's general mailing address.[3]   The seven distinct parcel numbers total, in the aggregate, to more than 800 acres of the Plaintiff's ranch.

31.     Defendant EPA, having been fully aware that the Plaintiff's seven parcel numbers (properties) – i.e., "Facility" – spanned a vast physical area of approximately 800 acres, ensured

---

[3] Although the Information Request set forth eight parcel numbers, one of those eight was a duplicate.

COMPLAINT - 13

the USEPA Information Request, **nevertheless,** overbroadly defined the term "work activity" as including "any and all construction, excavation, diversion, clearing, grading, ditching, ponding, side casting, filling, dredging, hauling, and the placement of rock, sand, gravel, concrete, asphalt, soils, overburden, woody slash/debris, construction debris, garbage or any other fill material, dredged, material, or other pollutant within the meaning of Section 502(6) of the CWA."

32.     Defendant EPA, having been fully aware that the Plaintiff's seven parcel numbers (properties) – i.e., "Facility" – spanned a vast physical area of approximately 800 acres, and fully aware of the overbroad definition it had assigned to the term "work activity" as applied to those 800 acres, ensured the EPA Information Request, **nevertheless,** directed the Respondent to "provide all responsive information for the time period between January 1, 2014 and the date of [Respondent's] receipt of this Information Request," i.e., **a time period spanning eight (8) years – three years longer than the five (5) year-period prescribed by 28 U.S.C. §2462, the federal statute of limitations applicable CWA enforcement actions**.

33.     Defendant EPA, having been fully aware that the Plaintiff's seven parcel numbers (properties) – i.e., "Facility" – spanned a vast physical area of approximately 800 acres, fully aware of the overbroad definition it had assigned to the term "work activity" as applied to those 800 acres over an (8)-year time period – three years longer than the federal statute of limitations applicable to CWA enforcement actions, **nevertheless,** ensured the EPA February 10, 2010 letter: (a) required the Respondent to provide information and documents in response thereto within 30 days of Respondent's receipt of the Information Request; (b) warned Respondent that the "[f]ailure to fully and truthfully respond to this Information Request in a timely manner" may result in a CWA enforcement action seeking civil penalties being filed against it; (c) warned Respondent that "provision of false, fictitious, or fraudulent statements or representations" may result in the

imposition of criminal penalties; and (d) informed Respondent that Defendant EPA may use the "information provided in response to this Information Request" "in administrative, civil, or criminal proceedings."

34.     Defendant EPA, having been fully aware that the Plaintiff's seven parcel numbers (properties) – i.e., "Facility" – spanned a vast physical area of approximately 800 acres, fully aware of the overbroad definition it had assigned to the term "work activity" as applied to those 800 acres over an (8)-year time period – three years longer than the federal statute of limitations applicable to CWA enforcement actions, **nevertheless,** ensured the Information Request would comprise ten (10) full pages consisting of thirty-six (36) questions (most with multiple subparts) seeking information regarding Respondent's conducting of no fewer than ten **(10) distinct categories of activities**, without as much as a single reference to any specific area or location within the Plaintiff's approximately 800-acre site.  These ten (10) activities included: (**1**) gravel mining-excavation (Qs 9-11); (**2**) gravel washing (Qs 12-14); (**3**) roads (Qs. 15-17); (**4**) culverts (Qs 18-20); (**5**) waterway crossing (Qs 21-23); (**6**) gravel storage (Qs 24-26); (**7**) flood control (Qs 27-29); (**8**) agricultural activities (Qs 30-32); (**9**) other activities (Qs 32-35); and (**10**) trucking/hauling activities (Q 36).  Significantly, while each of the first nine activity categories queried whether the Respondent had applied for CWA Section 404 and 402 permits prior to commencing such activity, the tenth activity category (trucking/hauling) did not even mention CWA Section 404 and 402 activities, strongly suggesting that such activities do not fall under CWA Sections 404 and 402, and consequently, do not fall under either of the Defendants' CWA 404 or 402 jurisdiction.

### *The Plaintiff's Requests for Reasonable Time Extensions to Respond to the Defendant Agencies' February 10, 2021 Letters and Information Request*

35.     On or about March 12, 2021, the Plaintiff's local counsel received via email the Defendant Corps, Walla Walla District's letter correspondence responding positively to said

counsel's request made during the Zoom meeting convened earlier that day, for a 30-day extension of the initial deadline to respond to the Plaintiff's February 10, 2021 letter, from March 12, 2021 until April 12, 2021.

36.    On or about March 12, 2021, the Plaintiff's local counsel received an email from the Defendant EPA Region 10 Office of Regional Counsel responded positively to the Plaintiff's local counsel's request made earlier that day for a 30-day extension of the initial deadline to respond to the USEPA CWA Section 308 Information Request, from March 12, 2021 until April 19, 2021.

### *The Plaintiff's FOIA Requests Filed With the Defendant Agencies Sought Production of Photographic and Other Information and Map Imagery and Data Supporting the Bases Underlying the Federal Investigation of Alleged Potential CWA Violations the Defendant Agencies' February 10, 2021 Letters and Information Request Intentionally Neglected to Provide*

37.    On or about April 1, 2021, the Plaintiff's environmental counsel dispatched via email a FOIA request to the FOIA Officer of the Defendant Corps, Walla Walla District, Boise Regulatory Office.  The FOIA request sought digital and hardcopy information, **aerial and ground photographs, maps**, and other data in the possession of Defendant Corps Walla Walla District personnel identifying the locations of the areas of interest relating to and the bases for the Corps Walla Walla District's initiation of a CWA 404 investigation of the Plaintiff and its ranching and other operations/activities, specifically with reference to the matter designated as "NWW-2021-00077 – Ace Black Ranch-Bruneau River Dredge and Fill."

38.    On or about April 1, 2021, the Plaintiff's environmental counsel dispatched via email a FOIA request to the Assistant Regional Counsel for the Defendant EPA Region 10 seeking his liaison in forwarding this FOIA request to the EPA Region 10 FOIA Officer, given the absence of such FOIA Officer's email request on the EPA Region 10 website.   The FOIA request sought

digital and hardcopy information, **aerial and ground photographs, maps**, and other data in the possession of Defendant EPA Region 10 personnel identifying the locations of the areas of interest relating to and the bases for the Defendant EPA Region 10's initiation of a CWA 404/402 investigation of the Plaintiff and its ranching and other operations/activities, and its dispatch of an Information Request, specifically with reference to the matter designated as "Potential Violations of U.S. Clean Water Act §§ 308, 402, 404 20-C04 - INFORMATION REQUEST for Ace Black Ranches, LLP – Bruneau, ID Dated: February 10, 2021."

39.     On or about April 5, 2021, the Defendant Corps FOIA Officer acknowledged receipt of the Plaintiff's FOIA request via email.

40.     On or about April 5, 2021, the Plaintiff's environmental counsel received a telephone voicemail from the Defendant EPA Region 10 FOIA Officer, directing him to file the Plaintiff's FOIA request via the foiaonline.gov portal early the next morning so that it could be processed at once.

41.     On or about April 6, 2021, the Plaintiff's environmental counsel uploaded the Plaintiff's FOIA request for the Defendant EPA Region 10 onto the foiaonline.gov portal, filed it as directed, and received both a confirmation of said submission along with a tracking number, and a FOIA request assignment letter indicating that said request had been assigned for processing.

***Plaintiff's Good Faith Effort to Comply With the Defendant Agencies' February 10, 2021 Letters and Information Request and April 2021 Proposal to Schedule a May 2021 Onsite Visit, and To Secure the Defendant Agencies' Prompt and Full Responses to Its FOIA Requests Prior to the Scheduled May 18–20, 2021 Onsite Visit***

42.     On or about April 7, 2021, Plaintiff's local and environmental counsel, and Defendant Corps and Defendant EPA counsel collectively convened an internet-based Zoom meeting to discuss how the parties could cooperate with one another.  The discussion focused, specifically, on how the Plaintiff could provide responses to the Defendant agencies' information

request without the agencies first responding to the Plaintiff's FOIA request, thereby providing the Plaintiff with guidance regarding the activities in which it may engage without violating the CWA, as well as, with the information, maps, and data the Plaintiff needed to identify the specific areas of interest where the Defendant agencies had alleged that Plaintiff had committed potential CWA violations, and the bases for those allegations.  During and after this Zoom meeting, Plaintiff's local counsel, verbally and via email, requested an additional 90-day extension of the deadline for responding to the Defendant Corps' February 10, 2021 letter's request for information, from April 12, 2021 until July 12, 2021.

43.     On or about April 9, 2021, Plaintiff's local counsel received an emailed letter correspondence from Jeffery Kenknight, Chief Water Enforcement and Field Branch, of the Defendant United States Environmental Protection Agency Region 10 Seattle, Washington Office. The Defendant EPA's April 9, 2021 letter granted the Plaintiff's request for a second extension of the deadline for responding to the EPA Information Request, from April 19, 2021 until July 12, 2021, and requested that the Plaintiff provide whatever information it could to the Defendant EPA before the deadline.  The Defendant EPA April 9, 2021 letter stated that, "barring any truly exceptional and unforeseen circumstances, this is the final extension request that EPA will grant."

44.     On or about April 13, 2021, Plaintiff's local counsel received an emailed letter correspondence from Kelly J. Urbanek, Chief, Regulatory Division, of the Boise Regulatory Office of the Defendant Corps, Walla Walla District. While the Defendant Corps' April 13, 2021 letter granted the Plaintiff's requested 90-day extension, it also stated that, "barring exceptional and unforeseen circumstances, this will be the final extension of the deadline."  The Defendant Corps' April 13, 2021 letter stated that to address the Plaintiff's concerns identified during the April 7, 2021 Zoom meeting, "the Corps would like to schedule a site visit to [the Plaintiff's] property as

soon as practicable but preferably before the first or second week of May 2021."  The Defendant Corps' April 13, 2021 letter also sought a partial response to the questions contained in its February 10, 2021 letter, as it acknowledged that a full response "is not expected until July 12, 2021.  In addition, said letter stated that "the Corps is in receipt of [the Plaintiff's] Freedom of Information Act request" and is "in the process of responding in a timely and appropriate manner."

45.     On or about April 15, 2021, Plaintiff's environmental counsel dispatched via email a letter correspondence to the Defendant Corps in response to the Corps April 13, 2021 letter.   It reaffirmed the Defendant Corps Walla Walla District Regulatory Chief's recollection that Plaintiff's counsel had, during the April 7, 2021 Zoom meeting, conveyed the Plaintiff's intention to avoid committing CWA violations while conducting normal farming activities in the very generally identified physical areas under investigation.  It also copied the Defendant EPA Region 10 Chief of Water Enforcement, Project Manager, and Assistant Regional Counsel.

46.     The Plaintiff's April 15, 2021 letter response also positively received the Defendant Corps' proposal for an onsite visit within the month of May 2021, but it indicated that the proposal required several specific refinements before the Plaintiff could fully accept it.  First, the onsite meeting would need to be scheduled to enable the Plaintiff's New York–based environmental counsel, as well as, its local counsel and consultants, to be present.  Second, the letter reaffirmed how the Plaintiff's counsel "believe[d] the proposed onsite meeting would be that much more constructive, productive, and useful to all parties involved if [the Plaintiff's representatives] were fully informed about the areas of concern evidenced by the information, map imagery, and data the Defendant agencies were expected to provide when responding to these FOIA requests, *prior* to said onsite meeting." (Emphasis in original.) Third, the letter proposed that the scope of the onsite visit focus upon "the fields located nearest to, alongside, and across the Bruneau River,

including how to protect those fields from seasonal river flooding or inundation." These were the areas which the Plaintiff believed the Defendant Corps' February 10, 2010 potential violation letter had generally identified, and with respect to which the Plaintiff had conveyed its express intention to remain CWA 404-compliant. Fourth, given the overwhelming financial and human resource burden the two federal agencies' simultaneous CWA investigations had placed upon the Plaintiff, which is **not** an industrial agricultural producer, the Plaintiff's April 15, 2021 letter requested, consistent with the Defendant agencies' memorandum of agreement concerning CWA 404 enforcement referenced within the Defendant Corps' February 10, 2021 letter, that the Defendant Corps assume the lead enforcement role on these CWA 404 matters.

47.     On or about April 22, 2021, the Plaintiff's environmental counsel received an emailed letter correspondence from Kelly J. Urbanek, Chief, Regulatory Division, of the Boise Regulatory Office of the Defendant Corps, Walla Walla District, which replied to each of the four points of refinement contained in the Plaintiff's April 15, 2021 letter. First, the Defendant Corps expressed no objection to including the Plaintiff's consultants at the site visit. Second, the Defendant Corps indicated it was in receipt of the Plaintiff's FOIA request and was appropriately processing it. Third, the Defendant Corps expressed disagreement with the Plaintiff's request to limit the scope of the onsite visit to "the fields nearest to, alongside, and across the Bruneau River and on farming activities." Fourth, the Defendant Corps indicated that it and the Defendant EPA would "consider" the Plaintiff's request for the Defendant Corps to assume the lead enforcement agency role in this matter.

48.     On or about April 22, 2021, the Plaintiff's counsel received an emailed letter correspondence from and electronically signed by Jeffery Kenknight, Chief Water Enforcement and Field Branch, of the Defendant United States Environmental Protection Agency Region 10

Seattle, Washington Office. It expressed Defendant EPA's appreciation for the Plaintiff's receptivity for an inter-agency Site visit. Additionally, however, the USEPA April 22, 2021 letter expressed the agency's position that "**the timing of EPA's response to your FOIA request should not delay scheduling a Site visit**." (Emphasis added.) Said letter, furthermore, stated that "EPA requests your client's consent for EPA representatives, including counsel, to enter and access the Site beginning May 10, 2021," which "will require multiple days onsite [during…] that same week […g]iven the size of the Site and the scope of recent activities with potential Clean Water Act implications." The Defendant EPA's April 22, 2021 letter also stated that, "[i]n advance of the Site visit, EPA is willing to share with your client's representatives **an outline of the proposed areas of the Site that EPA would like to view during the visit**." (Emphasis added.) The Defendant EPA's April 22, 2021 letter, furthermore, requested the Plaintiff's "response to this letter no later than the end of the business day on April 26, 2021."

49.     On or about April 26, 2021, the Plaintiff's environmental counsel dispatched via email a reply letter correspondence to the Defendant Corps' April 22, 2021 reply letter. The Plaintiff's April 26, 2021 letter copied the Defendant EPA Region 10's Water Enforcement Chief, Project Manager, and Assistant Regional Counsel, along with three Idaho state agencies.

50.     The Plaintiff's April 26, 2021 letter stated that it would be most convenient for the Plaintiff and its representatives if the onsite meeting were scheduled "during the third week of May,  i.e., for a two-, or at most a three-, successive day inspection during the week of May 17, 2021 – either Tues–Thurs. or Weds.–Fri." It also reemphasized the Plaintiff's need for the Defendant Corps to expeditiously process the Plaintiff's FOIA request so that the Plaintiff could secure and review "the technical and other information serving as the grounds for the Defendant Corps' concern that there  'may have' been unauthorized 'discharge[s] of dredged or fill material'

allegedly 'below the ordinary high water mark of the Bruneau River, and in slough and wetlands adjacent to the Bruneau River,' in alleged areas that 'may be waters of the United States.'"

51.     The Plaintiff's April 26, 2021 letter again sought the Defendant Corps' agreement to limit the scope of the proposed onsite visit to "the physical areas [that…] support [the Plaintiff's] normal farming operations that are located on the fields nearest, alongside, and on both sides of, the Bruneau River, and include the essential Bruneau River crossing areas and adjacent riverbanks that are indispensable to facilitating and preserving such longstanding operations."  Furthermore, the letter reassured the Walla Walla District Regulatory Chief that the Plaintiff remained "amenable to broadening the scope of the forthcoming onsite visit if, and to the extent, the technical and other information the Corps and EPA provides [the Plaintiff] in response to the outstanding agency FOIA requests, prior to the scheduled visit, reveals activities undertaken beyond these areas…"

***The Defendant EPA's Partial Response to the Plaintiff's FOIA Requests Filed With Both Agencies Does Not Enable the Plaintiff to Adequately Defend Itself in the Agency's Administrative Investigation Because It Failed to Provide Photographs, Map Imagery, or Other Information Identifying the Specific Areas of Alleged Potential CWA Violations Prior to the Scheduled May 18–20, 2021 Onsite Visit***

52.     On or about April 28, 2021, the Plaintiff's environmental counsel received an emailed letter response to its April 26, 2021 letter from the Defendant Corps confirming an onsite visit at the Plaintiff's ranch during "[t]he dates of May 18–20, 2021."  The Defendant Corps' April 28, 2021 letter stated that, "[a]s noted in EPA's letter to you dated April 22, 2021, **EPA is preparing an outline of the proposed areas of the site that the agencies would like to view** during the visit and is willing to share the outline with your clients and their representatives in advance of the site visit." (Emphasis added.)

53.     On or about April 29, 2021, the Plaintiff's environmental counsel received a letter from the Defendant Corps FOIA Officer.  It stated that, "[a]fter completing the search for the records and review by the Walla Walla District, in consultation with EPA Region 10, I determined that EPA Region 10 is best able to properly determine disclosure of these records.  In accordance with 32 C.F.R. § 286.7(d)(2), **I am therefore referring the requested documents to EPA Region 10 for a final release determination** and direct response to you." (Emphasis added.)

54.     On or about May 4, 2021, the Plaintiff's environmental counsel received via email a letter correspondence from the Defendant EPA Region 10's FOIA Office Director in response to the Plaintiff's FOIA request filed with Defendant EPA on April 2, 2021, which was recorded as received on April 6, 2021.  The Defendant EPA's May 4, 2021 FOIA response letter stated that it was an "**interim response**." (Emphasis added.)   The Defendant EPA's May 4, 2021 FOIA response letter falsely portrayed the Plaintiff's FOIA request as "complex" and feigned the need for the Defendant EPA to reconfirm the types of information/records the Plaintiff was seeking, and also feigned the need for the Defendant EPA to seek extensive consultation with other agencies "having a substantial interest in the determination of the request or among two or more components of the Agency having a substantial subject-matter interest therein."

55.     The Defendant EPA's May 4, 2021 FOIA response letter set forth an internet hyperlink to the foiaonline.gov website for said counsel to access under the Plaintiff's FOIA Tracking Number the six documents comprising the "interim response."

56.     The first of Defendant EPA's six FOIA interim response documents included a U.S. Fish and Wildlife Service ("USFWS")–generated list of species and critical habitat under USFWS jurisdiction "known or expected to be on the or near the project area" – i.e., "Ace Black Ranch-Bruneau River ENF[,] Owyhee County, Idaho."

57.     The second of Defendant EPA's six FOIA interim response documents included a U.S. Geological Survey ("USGS") "StreamStatsReport" with a **small obscured mapped image of the Bruneau River subbasin covering <u>a 2,751 square mile area</u>**.

58.     The third of Defendant EPA's six FOIA interim response documents included a U.S. Department of Agriculture Natural Resources Conservation Service ("USDA-NRCS") "Custom Soil Resource Report for Elmore County Area, Idaho, Parts of Elmore and Owyhee Counties – Ace Black Ranch-Bruneau River ENF" dated, January 28, 2021,  specifically revealing **information describing and an obscured soil mapping image depicting a <u>528.7-acre area of interest</u> comprising approximately 66% of the Plaintiff's approximately 800-acre ranch**, without providing any reference to a land or air-based professional survey thereof having been performed.

59.     The fourth of Defendant EPA's six FOIA interim response documents included a **one-page** Idaho Department of Environmental Quality ("IDEQ") Bruneau River "Subbasin 17050102" "Assessment Unit Status Report 2016" of **an 11-year-old assessment** of 16.90 miles of the Bruneau River performed on **January 29, 2010**, generally revealing that said portion of the Bruneau River **did not then support** cold water aquatic life or salmonid spawning due to habitat, water temperature and phosphorous (included in the **EPA 1998 total daily maximum load** ("**TDML**")), **and only then supported** primary contact recreation.

60.     The fifth of Defendant EPA's six FOIA interim response documents included a **one-page** USFWS National Wetlands Inventory Map image entitled "Ace Black Ranch-Bruneau River ENF," **generally depicting the Plaintiff's approximately 800-acre ranch**, without providing any reference to a land or air-based professional survey thereof having been performed.

61.     The sixth of Defendant EPA's six FOIA interim response documents included a **two-page** IDEQ/EPA Bruneau River Subbasin 17050102 "Idaho NHDPlus Ver. 2 Flowline Value Added Attributes" report concerning a **.39-mile portion** of the Bruneau River, and revealing the "Drainage/Catchment Area Characteristics," "Cumulative Land Cover," and "Mean Annual Flow Velocity" of natural flows in a total drainage area of 7,116 square kilometers/1.76 million acres (or 2,899 total stream miles), and of runoff into the Bruneau River from a land area comprising in total approximately 1,758,544 acres, 3,045 acres of which (.00173147 %, or **less than .2%) consist of wetlands**.

62.     **None** of Defendant EPA's six FOIA interim response documents included any aerial or ground photographs, maps, or other images capturing any potentially unauthorized CWA activities the Plaintiff allegedly conducted on specific portions of the Plaintiff's approximately 800-acre ranch or at any specific portion of the Bruneau River and/or its wetlands and tributaries adjacent to the Plaintiff's ranch.  The absence of any such evidence from the Defendant EPA's interim FOIA response strongly suggests, if not, clearly indicates that the scheduled May 18–20, 2021 onsite inspection of approximately 383 acres of the Plaintiff's approximately 800-acre ranch is nothing but a "**fishing expedition**."

63.     More significantly, **the Defendant EPA's May 4, 2021 interim FOIA response does not enable the Plaintiff and its representatives to identify those of the Plaintiff's farming and other activities that could have potentially violated CWA Sections 404 or 402, and consequently, prevents the Plaintiff's representatives from adequately defending the Plaintiff, including its owners and employees, against the Defendant federal agencies' allegations of potential CWA violations in the current administrative investigation**, which renders them more vulnerable to becoming the subject of a CWA enforcement action.

64.     In addition, the Defendant EPA May 4, 2021 FOIA response letter stated that, "records determined responsive to the FOIA request that you submitted to the Corps (FACTS-21-014374) were referred to EPA. We are continuing to process the remainder of your request as expeditiously as possible."   Said letter, however, did **not** clearly indicate whether the six documents comprising Defendant EPA's interim FOIA response were the Defendant Corps "records determined responsive to the FOIA request […] submitted to the Corps" that had been "referred to EPA," or were instead documents determined responsive to the FOIA request the Plaintiff submitted to the Defendant EPA, itself – EPA-R10-2021-003534.

65.     The Defendant EPA's May 4, 2021 FOIA response letter, furthermore, stated that, "at this time EPA estimates the Agency will be able to complete the response to this request by **October 14, 2021**," and "expect[s] to provide the next response to you on or about **July 15, 2021**." (Emphasis added.)   Clearly, Defendant EPA has **intentionally** withheld from its May 4, 2021 FOIA response, until, at least, **July 15, 2021**, and perhaps, until **October 14, 2021**, the critically important photographic and other information identified in the Plaintiff's two FOIA requests which the Plaintiff's representatives desperately need to review to adequately defend the Plaintiff's interests in this multi-agency investigation.   The Defendant EPA had been quite aware, as of May 4, 2021, that it would not be providing the next response to the Plaintiff's FOIA request by the **July 12, 2021 deadline** it and the Defendant Corps had previously imposed upon the Plaintiff for providing complete responses to Defendant EPA's CWA Section 308 Information Request and to the Defendant Corps' February 10, 2021 questions.

66.     On or about May 7, 2021, the Plaintiff's local counsel received an email from the Defendant EPA Region 10's Assistant Regional Counsel that was accompanied by two document attachments.   The first attachment entitled, "Site Visit Agenda," consisted of the following

information: (**1**) the meeting location and time; (**2**) the attending agency representatives' contact information; (**3**) the 383-acre scope of the site visit; and (**4**) the dates and times of the opening and closing conferences between the Defendants' and Plaintiff's representatives.   The second attachment entitled, "Site Visit Outline," depicted a map image (similar to the map image contained in the January 28, 2021 USDA-NRCS custom soil survey report) upon which an orange polygon was inset **representing the 383-acre area of interest** for the scheduled May 18–20, 2021 onsite inspection.  As the May 7, 2021 email stated, "[i]n general, EPA and the Corps intend to focus **this** visit on collecting data within the boundary generated by the thick orange line on the attached aerial image." (Emphasis added.)  Although said email did not mention anything about a future site visit, the email's reference to "**this visit**" (emphasis added) clearly conveyed that the Defendant agencies would seek to schedule additional visits to the Plaintiff's ranch at a future time based on the information and data collected at the May 18–20, 2021 onsite visit.

### COUNT I –
### VIOLATION OF THE FOURTH AMENDMENT

67.     The Plaintiff hereby re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs.

68.     The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "The basic purpose of this Amendment […] is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camera v. Municipal Court*, 387 U.S. 523, 528 (1967).

69.     The Fourth Amendment text "expressly imposes two requirements: First, all searches and seizures **must be reasonable**.  Second, a warrant may not be issued unless probable

cause is properly established **and the scope of the authorized search is set out with particularity**." (Emphasis added.) *Kentucky v. King*, 563 U.S. 452, 459 (2011).

70.     The Fourth Amendment does not require that reasonableness review be deferential to the government, especially given the Framers' concerns which motivated them to include the Fourth Amendment in an affirmative Bill of Rights.  The Fourth Amendment's central meaning "is **distrust of police power**[4] **and discretion**.  When viewed this way, the Fourth Amendment synchronizes with other parts of the Constitution **designed to limit governmental powers**." (Emphasis added.) *See* Tracy Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. & Mary L. Rev. 197, 201–202 (1993).

71.     "The [F]ramers declared a broad principle about governmental power in guaranteeing freedom from unreasonable search and seizure.  Under that broad principle, government authority and discretion would not go unchecked.  Put in simpler terms relevant to our current times, the broad principle embodied in the [Fourth Amendment's] Reasonableness Clause

---

[4] For a modern discussion of the debate surrounding the exercise of "police powers," and whether there is a federal police power in the context of federalism (e.g., to protect the environment and public health), *See United States v. Morrison*, 529 U.S. 598, 615 (2000) (citing *United States v. Lopez*, 514 U.S. 549, 564 (1995) (wherein the Court held that, "the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded.")  *See also Id*. at 618–19 (wherein the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce," and held that "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States."  The Court's reasoning was based on its decision in *Lopez*, 514 U.S. at 566 (1995) (citing Art. I, §8), in which Justice Thomas joined, holding that "[t]he Constitution … withhold[s] from Congress a plenary policy power that would authorize enactment of every type of legislation," and also on the Thomas concurring opinion in *Lopez*, 514 U.S. at 584–85 (citing *New York v. United States*, 505 U.S. 144, 155 (1992)), in which he argued that the Court "*always* ha[s] rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power.").  *See also* D. Benjamin Barros, *The Police Power and the Takings Clause*, 58 Univ. of Miami L. Rev. 471, 474–77 (2004).

is that discretionary police power implicating Fourth Amendment interests **cannot** be trusted."
(Emphasis added.) *Id.*, 35 Wm. & Mary L. Rev. at 229.

72.     "Whether a search is **reasonable** under the Fourth Amendment requires a case-by-
case '**balancing** of the need for the particular search against the invasion of personal rights that
the search entails…'" (Emphasis added.)  *Byrd v. Maricopa County Sheriff's Dept.*, 629 F.3d 1135,
1141 (9th Cir. 2011) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  The required factors for
courts to consider include: (1) 'the scope of the particular intrusion,' (2) 'the manner in which it is
conducted,' (3) 'the justification for initiating it,' and (4) 'the place in which it is conducted.'" *Id.*

73.     "The Supreme Court has made clear that Fourth Amendment protection is not
restricted to searches and seizures designed to uncover criminal wrongdoing." *United States v.
Int'l Bus. Machines, Corp.*, 83 F.R.D. 97, 103 (S.D.N.Y. 1979) (citing *Camera*; *See v. City of
Seattle*, 387 U.S. 541, 543–44 (1967); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)). *See*
accord *Walnut Hill Estate Enterprises v. City of Oroville*, Case No. 2;09-cv-00500 (E.D. Calif.
July 21, 2010), Slip op. at 5 (quoting *Donovan v. Dewey*, 452 U.S. 594, 598 (1981), holding that
"'the Fourth Amendment's prohibition against unreasonable searches applies to administrative
inspections of private commercial property.'").

74.     Because a request for entry onto designated lands entails materially greater burdens
and risks to personal freedom, liberty, and security than do requests for documents, courts within
the Ninth Circuit have held that "requests for inspection must be proportional – i.e., the degree to
which the proposed inspection will aid in the search for truth must be balanced against the burdens
and dangers created by it. *See United States v. 400 Acres of Land*, Case No. 2:15-cv-01743 (D.
Nev., Mar. 10, 2017), Slip op. at 3 (quoting *Belcher v. Basset Furniture Indus., Inc.*, 588 F.2d 904,
908 (1978) ("district courts in this this circuit have adopted the Fourth Circuit's approach to

requests to enter and inspect land as set forth in *Belcher* […] In *Belcher*, '[s]ince entry upon a party's premises may entail greater burdens and risks than mere production of documents, a greater inquiry into the necessity for inspection would seem warranted.'"); *Lopez v. United States*, Case no. 15-cv-180 (S.D. Cal. March 21, 2017), Slip op. at 5; *Skazzi3 Capital Ltd. V. Pathway Genomics Corp.*, Case No. 18-cv-317 (S.D. Cal. Mar. 3, 2020), Slip op. at 5; *Fratus v. Cnty. Of Contra Costa*, Case No. 14-cv-05533 (N.D. Calif. July 27, 2015), Slip op. at 6.

75.     Only the USDA-NRCS Custom Soil Resource Report produced as one of the six documents comprising the Defendant EPA's May 4, 2021 interim FOIA response, and the Site Visit Agenda accompanying the Defendant EPA's May 7, 2021 email to the Plaintiff's counsel, generally reveal the physical scope of the scheduled three-day May 18–20, 2021 inspection by the Defendant agencies of the Plaintiff's properties.   According to these documents, the general physical scope of the impending conditional onsite inspection **spans 383 acres comprising ~ 48% of the Plaintiff's approximately 800-acre ranch**.

76.     The Plaintiff previously consented to the scheduled three-day May 18–20, 2021 onsite inspection of its 800-acre ranch **on the condition that** the Defendant agencies provided such information **prior to the inspection date**.

77.     The Defendant EPA's six FOIA interim response documents provide only general information about the physical characteristics of the Bruneau River subbasin, and otherwise fail to include any aerial or ground photographs, maps, or other images the Plaintiff's FOIA responses seek that would enable the Plaintiff and its representatives to identify the specific physical areas where the Plaintiff allegedly conducted potentially unauthorized CWA activities, namely, the specific portions of the Bruneau River and/or its wetlands and tributaries adjacent to the Plaintiff's ranch.

78.     The absence of any such evidence from the Defendant EPA's interim FOIA response strongly suggests, if not, clearly indicates that the scheduled May 18–20, 2021 onsite inspection of approximately 383 acres of the Plaintiff's approximately 800-acre ranch is nothing but a "**fishing expedition**."

79.     The scope of the Defendant agencies' inspection demands, therefore, constitutes an **unreasonable** search and seizure in violation of the Fourth Amendment, because the degree to which the conditionally scheduled inspection of 383 acres of the Plaintiff's 800-acre ranch will aid in the search for truth, in the absence of such evidence presented to the Plaintiff prior to the May 18–20, 2021 inspection date, is patently disproportionate to the burdens it places upon and the dangers it poses to the Plaintiff's personal freedom, liberty, and security interests.

**COUNT II –**
**VIOLATION OF THE FIFTH AMENDMENT DUE PROCESS CLAUSE**
**SUBSTANTIVE DUE PROCESS**

80.     The Plaintiff hereby re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs.

81.     The Fifth Amendment Due Process Clauses expressly prohibit the Federal Government from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. V.

82.     "The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) (citing *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). The "Due Process Clause 'protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Glucksberg*, 521 U.S. at 719–20 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "The Clause also provides heightened protection against

government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720 (citing *Reno v. Flores*, 507 U.S. 292, 301–02 (1993) and *Planned Parenthood v. Casey*, 505 U.S. 833, 851, (1992) (holding that "a liberty interest protected under the Due Process Clause […] will be deemed fundamental if it is 'implicit in the concept of ordered liberty.'" (citing *Palko v. Connecticut*, 302 U.S. 319, 325 (1937))).

83.     The Fifth Amendment Due Process Clause recognizes and preserves the fundamental right of individuals to lead their lives free from unreasonable and arbitrary government actions that harm life, liberty, and property. *Moore v. East Cleveland*, 431 U.S. 494, 501 (1977) (holding that "'the full scope of the liberty guaranteed by the Due Process Clause […] includes a freedom from all substantial arbitrary impositions and purposeless restraints…'") (quoting *Poe v. Ullman*, 367 U.S. 497, 542-543 (1961) (Harlan, J. dissenting)).

84.     These inherent fundamental rights derive from the basic social contract, antecedent to government, and include the negative right of exclusion – the right to be let alone. *Casey*, 505 U.S. at 851, (1992).  And, the fundamental right to be let alone derives from the Declaration of Independence and the social contract. *See Olmstead v. United States*, 277 U.S. 438, 478 (1928).

85.     The Due Process Clause, therefore, "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Glucksberg*, 521 U.S. at 720–721 (quoting *Moore*, 431 U.S. at 503) (quoting *Palko*, 302 at 325, 326).

86.     "When the government brings legal actions against individuals and seeks to deprive them of liberty interests, the constitutional concerns are at their zenith." Therefore, a substantive

due process claim [must] be based on […] fundamental rights." *Brittain v. Hansen*, 451 F.3d 982, 989, 992 (9th Cir. 2006).

87.     A substantive due process claim brought by a landowner requires that "the interference with property rights was irrational or arbitrary." *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988) (holding that there was a violation of substantive due process rights, where the landowner satisfied all of the requirements necessary for the issuance of a building permit, but the city council nevertheless voted to withhold the building permit, and the municipal regulations did not provide the landowner with any process to review that decision). *See* accord *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976); *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, Case No. S-10-2414 (E.D. Cal. March 29, 2012), Slip op. at 34–35 (citing *Del Monte Dunes at City Of Monterey, Ltd. V. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990), for the proposition that "the Ninth Circuit has recognized that such claims are sufficient to withstand a motion to dismiss.").

88.     The administrative record in this matter reflects that, one day after the Defendant Corps had secured the Plaintiff's consent to convene an onsite visit of its ranch during the third week of May 2021 (April 28, 2021), the Defendant Corps' FOIA Office informed the Plaintiff's counsel in writing that it had completed its search for the requested records and that the Walla Walla District Office had completed its review of those requested documents. (April 29, 2021).

89.     The administrative record in this matter also reflects, however, that the Defendant Corps FOIA Office informed the Plaintiff's counsel in writing that, based on the Walla Walla District Office review of the FOIA response records in consultation with Defendant EPA Region 10, the Defendant Corps FOIA Officer determined he will be "referring the requested documents to Defendant EPA Region 10 for a final release determination." (April 29, 2021).

90.     The Defendant EPA Region 10's May 4, 2021 interim FOIA response letter thereafter falsely portrayed the Plaintiff's FOIA request as "complex" and also feigned the Defendant EPA Region 10's need to reconfirm the types of information/records the Plaintiff was seeking.  The Defendant EPA Region 10's May 4, 2021 interim FOIA response letter, furthermore, feigned the Defendant EPA's need to seek extensive consultation with other agencies "having a substantial interest in the determination of the request or among two or more components of the Agency having a substantial subject-matter interest therein."

91.     Despite the written assurances the Defendant agencies previously provided to the Plaintiff and its representatives that they each would work pursuant to the FOIA process to timely produce information responsive to the Plaintiff's FOIA requests, including aerial and ground photographs, maps and other images capable of enabling the Plaintiff and its representatives to identify the specific physical areas on its properties where the Plaintiff has been alleged to have committed potential CWA 404 and 402 violations, prior to any scheduled inspection of the Plaintiff's ranch, the Defendant agencies have, thus far, failed to timely produce such information.

92.     None of Defendant EPA Region 10's six FOIA interim response documents produced on May 4, 2021, included any aerial or ground photographs, maps, or other images capturing any potentially unauthorized CWA activities the Plaintiff allegedly conducted on specific portions of the Plaintiff's approximately 800-acre ranch or at any specific portion of the Bruneau River and/or its wetlands and tributaries adjacent to the Plaintiff's ranch.

93.     Neither the Defendant agencies' joint "Site Visit Agenda" nor their "Site Visit Outline" produced on May 7, 2021, contained any aerial or ground photographs or map images or information or data that could enable the Plaintiff and its representatives to identify the specific areas on the Plaintiff's ranch, where any one or more of the Plaintiff's specific farming and other

activities could have potentially violated CWA Sections 404 or 402, as the Defendant agencies have alleged.

94.     The Defendant EPA Region 10's May 4, 2021 interim FOIA response expressly indicates that the Defendant EPA is **not** likely to produce such information, at the earliest, before July 15, 2021, and at the latest, before October 14, 2021, even though the Defendant agencies' inspection of 383 acres of the Plaintiff's 800-acre ranch is scheduled to take place on May 18–20, 2021.

95.     The earliest date by which the Defendant EPA Region 10 might provide such information to the Plaintiff pursuant to the FOIA process is July 15, 2021, which is three days later than the July 12, 2021 deadline both Defendant agencies imposed on the Plaintiff to respond to the Defendant Corps February 10, 2021 questionnaire and to the Defendant EPA's CWA Section 308 Information Request.

96.     Given the pre-enforcement stage of the Defendant agencies' current investigation of the Plaintiff's potential CWA 404 and 402 violations, and the Plaintiff's inability to obtain such information by alternative means before July 12, 2021, the Plaintiff will likely be unable to fully, accurately, and timely respond to the Defendant agencies' questionnaire and CWA Section 308 Information Request.  Consequently, the Defendant EPA will likely impose substantial CWA Section 308 noncompliance penalties upon the Plaintiff pursuant to CWA Section 309.

97.     The Defendant agencies' failure to provide to the Plaintiff and its representatives with an adequate FOIA response that includes such information, prior to the scheduled May 18–20, 2021 onsite inspection, serves to substantially undermine the ability of the Plaintiff's counsel and technical consultants to develop an adequate legal and scientific defense for the Plaintiff,

including its owners and employees, against the Defendant agencies' allegations of "potential" CWA 404 and 402 violations.

98.     The Plaintiff's counsel' and technical consultants' inability to develop an adequate legal and scientific defense for the Plaintiff at this pre-enforcement stage, renders the Plaintiff, including its owners and employees, vulnerable to an adverse administrative investigation determination, and increases the likelihood that the Plaintiff will be subject by the Defendant agencies to a subsequent CWA enforcement action for alleged CWA noncompliance.

99.     Neither the Defendant Corps nor the Defendant EPA Region 10 have satisfactorily explained why they decided the Defendant Corps would refer the Defendant's FOIA response to the Plaintiff to the Defendant EPA Region 10 for a final release determination.

100.     The Defendant EPA Region 10 also has failed to satisfactorily explain why it cannot provide to the Plaintiff and its representatives, prior to the scheduled May 18–20, 2021 onsite visit, any aerial or ground photographs or map images or other information currently possessed by EPA Region 10 personnel that could enable the Plaintiff and its representatives to identify the specific physical areas on its properties where any one or more of the Plaintiff's specific farming and other activities could have potentially violated CWA Sections 404 or 402, as the Defendant agencies have alleged.

101.     The Defendant EPA Region 10 FOIA Office, furthermore, has failed to satisfactorily explain why it cannot provide "the next response" to the Plaintiff and its representatives until July 15, 2021, which is three days after the final July 12, 2021 deadline that the Defendant EPA Region 10 had provided to the Plaintiff for purposes of completing its response to the Defendant EPA Region 10's CWA Section 308 Information Request.

102.    Given the Defendant agencies' collective failure to provide satisfactory explanations regarding any of these agency actions, it may be reasonably concluded that the Defendant agencies have acted arbitrarily and capriciously, if not, **intentionally** in both failing to provide timely and adequate responses to the Plaintiff's FOIA requests, and in withholding the necessary requested information from the Plaintiff and its representatives before the scheduled May 18–20, 2021 onsite inspection takes place.

103.    The Defendant EPA Region 10 failed to abide by the November 21, 2018 USEPA Memorandum issued by the EPA Office of Water setting forth the National Water Program Policy on Use of Clean Water Act Section 308 Letters Issued to Nine or Fewer Entities to Support CWA Program Implementation.  The EPA 308 Letter Memorandum, which must be used by EPA's Regional Water Divisions for purposes **not** related to compliance and enforcement, emphasizes early engagement with stakeholders prior to issuing a CWA Section 308 letter.  It recognizes that **"collecting information in response to a CWA Section 308 letter usually requires a significant expenditure of time, financial resources, and effort by affected entities**." It defines "burden" "broadly […] to include all 'time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency.'" (Emphasis added.)

104.    The EPA 308 Letter Memorandum also requires that "the recipient and circumstances should be considered when determining the appropriate tone for CWA Section 308 letters. The type and size of the business, prior Agency interactions, the necessity for the EPA to receive the information in a timely manner, and any potential threat to human health or the environment are all factors that could influence the language and tone of the request."

105.    The EPA 308 Letter Memorandum, in addition, emphasizes that, "[a]lthough it should be clear that the information request is being issued pursuant to the EPA's statutory

authority, citation to statutory penalties for failure to respond is not always necessary or appropriate. For example, it may be sufficient to indicate that the EPA is authorized to require the submission of information under CWA Section 308 **in an initial request to a smaller entity that has little or no experience with the EPA's regulatory authorities**." (Emphasis added.)

106.    The EPA 308 Letter Memorandum, furthermore, emphasizes that, "**prior to submitting a CWA Section 308 letter, regulatory staff should engage with the potential recipient(s) to discuss the information request**, review the scoping outline, and attempt to collaborate on a reasonable strategy for the EPA to obtain the required information.  Regulatory staff should seek feedback on the scoping outline, be receptive to suggested alternatives for obtaining the information, and consider concerns and challenges articulated by the potential recipient." (emphasis added).

107.    The EPA 308 Letter Memorandum, moreover, states that "[i]n the event early dialogue and collaboration fails to result in submission of the required information, regulatory staff should confer with immediate management to discuss why the collaboration was unsuccessful. If it is determined that a CWA Section 308 letter may be needed, a draft letter should be generated […] and [t]o promote further engagement and dialogue, the draft letter should be shared with the intended recipient before it is finalized and formally issued."  Most significantly, the EPA 308 Letter Memorandum admonishes EPA staff and management that, "**CWA Section 308 letters should be used only as a last resort in the event collaboration with the potential recipient is not productive or fails to provide the information required, or when specifically requested by the recipient**." (Emphasis added.)

108.    The Defendant EPA Region 10 failed to satisfactorily explain why it issued a Section 308 letter warning of the potential for an enforcement action and penalties to the Plaintiff,

which is a small unregulated business entity with no prior experience with EPA, as a first resort rather than as a last resort after first seeking to collaborate with the Plaintiff to obtain the desired information, as the November 21, 2018 EPA 308 Letter Memorandum required.

109.    Given the Defendant EPA Region 10's failure to provide a satisfactory explanation regarding why it did not first communicate and interact with the Plaintiff in a collaborative fashion seeking to obtain the information it now seeks about the Plaintiff's ranch and ranching and other operations before issuing the February 10, 2021 CWA Section 308 Information Request containing warnings of a potential enforcement action and penalties, it may be reasonably concluded that the Defendant EPA Region 10 acted arbitrarily and capriciously, if not, **intentionally** in failing to follow the November 21, 2018 EPA 308 Letter Memorandum, and seeking to intimidate and harass the Plaintiff, including its owners and employees.

110.    The Plaintiff, including its owners, have a protectible property interest in the Bruneau, Idaho-based 800-acre family ranch they have owned and operated as a small business since the mid-1800's. *See Bateson*, 857 F.2d at 1303; *Usery*, 428 U.S. at 15; *Hardesty*, Slip op. at 34-35; *City of Monterey*, 920 F.2d at 1508.

111.    The Defendant agencies' arbitrary and capricious acts violate the fundamental liberty interests of the Plaintiff, including its owners and employees, and thus the Plaintiff's substantive due process right to be treated fairly consistent with the Fifth Amendment to the Constitution, by denying it the information required to engage in a robust self-defense against the Defendant agencies' allegations of CWA noncompliance and to continue using its private property and operating the family ranch and farming business, in existence since the mid-1800's to earn a living by farming without undue governmental interference. *See Burney v. Young*, 133 S.Ct. 1709 (2013); *Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978); *Supreme Court of N.H. v. Piper*, 470 U.S.

274, 280 (1985). *See* accord *Truax v. Raich*, 239 U.S. 33, 41 (1915) (holding that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure.").

**COUNT III –**
**VIOLATION OF THE FIFTH AMENDMENT DUE PROCESS CLAUSE**
**PROCEDURAL DUE PROCESS**

112.     The Plaintiff hereby re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs.

113.     "The requirements of procedural due process apply only to the deprivations of interests encompassed by the [constitutional] protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). "By requiring the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty, or property,' the Due Process Clause promotes fairness in such decisions." *Daniels v. Williams*, 484 U.S. 327, 331 (1986).

114.     "In a procedural due process claim, […] it is the deprivation of property or liberty without due process of law – without adequate procedures" that is unconstitutional. *Daniels*, 474 U.S. at 339, Stewart, J, Concur. Op.  A valid procedural due process violation claim is one which "challenges the [Federal] procedures for preventing or redressing the deprivation." *Id*. "To prevail, [a plaintiff] must show that they contain a defect so serious that we can characterize the procedures as fundamentally unfair, a defect so basic that we are forced to conclude that the deprivation occurred without due process." *Id*., 474 U.S. at 341.

115.     Similarly, the federal courts in the Ninth Circuit have held that to establish a procedural due process violation, a plaintiff must show that he had a protectible property interest, and if so, that he was denied this property right without the process which was due under the circumstances.  *Walls v. Central Contra Costa Transit Authority*, 653 F.3d 963, 967–68 (9th Cir.

2011); *Hardesty, supra*, Slip op. at 14 (citing *Walls*, 653 F.3d at 967–68). *See* accord *Bateson*, 857 F.2d at 1305.

116.    The Plaintiff, including its owners, have a protectible property interest in the 800-acre, Bruneau, Idaho-based family ranch they have owned and operated as a small business since the mid-1800's. *See Bateson*, 857 F.2d at 1303; *Usery*, 428 U.S. at 15; *Hardesty*, Slip op. at 34-35; *City of Monterey*, 920 F.2d at 1508.

117.    "The Clean Water Act generally targets industrial and municipal sources of pollutions, as is evident from a perusal of its many sections. Consistent with this focus, the term **'point source'** is used throughout the statute, but invariably in sentences referencing industrial or municipal discharges." (emphasis added). *U.S. v. Plaza Health Laboratories, Inc.*, 3 F.3d 643, 646 (2d Cir. 1993). For example, a number of CWA provisions contain the term "point source," including: "33 U.S.C. § 1311 (referring to 'owner or operator' of point source)"; "§ 1311(e) (requiring that effluent limitations established under the Act 'be applied to all point sources of discharge')"; § 1311)(g)(2) (allows an 'owner or operator of a point source' to apply to EPA for modification of its limitations requirements)"; "§ 1318(a) (administrator shall require owner or operator of any point source to install, use and maintain monitoring equipment or methods)"; and "§ 1318(c) states may develop procedures for inspection, monitoring, and entry with respect to point sources located in state)." However, agricultural stormwater discharges and irrigated agricultural return flows do not constitute a "point source." *See Cal. Sportfishing Prot. Alliance v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1044 (N.D. Calif. 2017) (citing 33 U.S.C. § 1362(14)); *Hiebenthal v. Meduri Farms*, 242 F. Supp. 2d 885, 888 (D. Or. 2002) (citing 40 C.F.R. § 122.3).

118.    "Inspections are permitted by 33 U.S.C. § 1318(a)(B), but are subject to certain conditions: a federal official 'shall have a right of entry to, upon, or through any premises in which

an effluent source **is** located…' once he presents his credentials and 'may at **reasonable times**…inspect any monitoring equipment or method…" (Emphasis added.) *Hardesty*, Slip op. at 31 (citing 33 U.S.C. § 1318(a)(B)(i) (CWA Section 308(a)(B)(i))).

119. "Under CWA § 308, the EPA has 'a right of entry to, upon, or through any premises in which an effluent source **is** located…and [may] sample any effluents' covered by this section in order to enforce the restrictions of the CWA." (Emphasis added.) *Matter of Alameda County Assessor's Parcel*, 672 F. Supp. 1278, 1283 (N.D. Calif. 1987) (citing 33 U.S.C. § 1318). "The EPA is empowered under § 308 [to] require the 'owner of any **point source** [discharging pollutants] to keep records and sample 'such effluents' as may be discharged on the property." (Emphasis added.) 672 F. Supp. At 1283.

120. While 33 U.S.C. § 1318(a) also vests the EPA with authority to conduct an inspection to "carry[] out sections 1315, 1321, 1342, 1344 (relating to <u>State</u> permit programs), 1345 and 1364 of this title," the statute's reference to section 1342 relates to the CWA Section 402 NDPES program applicable only if there an actual effluent "point source" exists, and the statute's reference to section 1344 relates to CWA Section 404 wetland dredge and fill permitting as part of a state permit program.  Neither the Defendant EPA Region 10 nor the Defendant Corps, nor the State of Idaho has determined whether there is an actual "point source" of effluents present on the Plaintiff's ranch, or whether the Plaintiff has actually committed a CWA Section 404 dredge and fill violation.

121. Aside from the applicable caselaw, there are final EPA regulations setting forth general basic procedures for conducting civil inspections pursuant to the authorities granted by numerous statutes, including CWA Section 308 (33 U.S.C. § 1318). *See* 85 Fed. Reg. 12224–25 (March 2, 2020) ("EPA On-Site Civil Inspection Procedures – Final Rule").  However, these

inspection rules do not expressly apply to non-regulated, non-industrial, non-municipal facilities, and do not otherwise provide any procedure for challenging an agency determination to undertake an inspection or the manner in which an agency inspection was performed.[5]

122.    Aside from the applicable case law and the on-site civil inspection procedures regulation, there is also the EPA "NPDES Compliance Inspection Manual" (EPA Publ. No. 305-K-17-001, Interim Rev. V. (Jan. 2017), which provides agency guidance to EPA inspectors of "NPDES facilities" where the agency "directly [implement[s] the program," or "in states with NPDES program authorization at the request of states to complement the state's own inspection efforts and to respond to tips or complaints." *Id*., at p. 3. "EPA's NPDES inspection program identifies and documents noncompliance, supports authorized state NPDES programs, supports the enforcement process, monitors compliance with enforcement orders and decrees, establishes presence in the regulated community, deters noncompliance, supports the permitting process, and furthers the broad watershed protection and restoration goals of the NPDES program." *Id*.

123.    "Routine EPA NPDES compliance inspections should be performed in a manner designed to: (1) "Determine compliance status with regulations, permit conditions, and other

---

[5] Similarly, although there are final Corps regulations encouraging Corps district engineers to encourage Corps employees, members of the public, federal, state, and local government agencies to report suspected CWA Section 404 violations to the Corps, and also encouraging Corps district engineers to schedule investigations to reflect the nature and location of the suspected CWA Section 404 violations so reported to confirm whether actual violations exist, these regulations are not mandatory, and there exist no standalone procedures for challenging a district engineer's decision to conduct such an investigation, or the manner in which the investigation was conducted. *See* 33 C.F.R. § 326.3(a)(b).  Granted, applicable caselaw provides a means to challenge a compliance/cease and desist order that a Corps district engineer issues **following the Corps' conducting of an onsite inspection**. *See Sackett v. Envt'l Agency*, 566 U.S. 120 (2012) (holding that a CWA compliance order issued by the Corps or EPA qualifies as an appealable final agency action under the Administrative Procedure Act).  **The Plaintiff, in the action at bar, however, cannot afford to wait, until after the completion of the Defendant agencies' mandated inspection of their 800-acre ranch scheduled for May 18–20, 2021, to make such a challenge**.

program requirements"; (2) "Verify the accuracy of information submitted by permittees"; (3) "Verify the adequacy of sampling and monitoring conducted by the permittee"; (4) "Gather[] evidence to support enforcement actions"; (5) "Obtain[] information that supports the permitting process"; and (6) "Assess[es] compliance with orders or consent decrees." *Id.*

124.    Neither the applicable caselaw, EPA On-Site Civil Inspection Procedures – Final Rule, nor the NPDES Compliance Inspection Manual, however, provide any guidance for conducting an EPA inspection of, let alone, challenging an EPA determination that an onsite inspection is required at a specific time at a designated "facility" of a nonregulated, non-NDPES-program-permitted, small ranching business that does not qualify as an industrial facility or a municipal facility, or that does **not** qualify as a "large concentrated animal feeding operation" ("CAFO") or a "medium CAFO," within the meaning of 40 C.F.R. § 122.23(a)-(b)(2),(4),(6), or has **not** already been designated a "small CAFO" within the meaning of 40 C.F.R. § 122.23(c) by an authorized State or by the EPA Administrator, thus, as a "point source," thereby rendering them subject to the NDPES permitting, monitoring, compliance, and inspection program.

125.    The Plaintiff does not qualify as an industrial facility, or as a municipal facility, and does not qualify and has not been designated as a small CAFO with an identified "point source."

126.    The Plaintiff, however, has been denied legal recourse to any administrative agency procedure (which is non-existent) to challenge the Defendant EPA Region 10's decision to mandate the inspection of 383 acres of the Plaintiff's 800-acre family ranch scheduled for May 18-20, 2021, which deprives the Plaintiff, including its owners and employees, of their protectible liberty interests, because the Defendant EPA Region 10 has also intentionally refused to adequately respond to the Plaintiff's previously filed FOIA request, by withholding all aerial or ground photographs or map images or other information or data that could enable the Plaintiff and

its representatives to identify the specific areas on the Plaintiff's ranch, where any one or more of the Plaintiff's specific farming and other activities could have potentially violated CWA Sections 404 or 402, as the Defendant agencies have alleged.

127.    The unavailability to the Plaintiff of an applicable federal procedure to challenge the Defendant EPA Region 10's determination that an inspection of 383 acres of the Plaintiff's ranch is mandated, especially in light of said Defendants' simultaneous determination to deprive the Plaintiff of the production of FOIA documents, including photographs and images capable of enabling it and its representatives to develop exculpatory defense evidence to counter the Defendant agencies' allegations of "potential violations" of CWA Sections 402 and 404, until after the scheduled May 18–20, 2021 inspection has already been completed, constitutes a federal procedural defect of such serious magnitude that it must be characterized as fundamentally unfair, and concluded that such deprivation occurred without procedural due process of law, in violation of the Fifth Amendment of the Constitution.

**COUNT IV –**
**EMERGENCY PRELIMINARY INJUNCTIVE RELIEF**

128.    The Plaintiff hereby re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs.

129.    The Plaintiff hereby requests that this Court grant it an emergency preliminary injunctive relief prohibiting the Defendant agencies and their personnel from entering upon/onto the Plaintiff's approximately 800-acre ranch located in Bruneau, Idaho, following the Plaintiff's withdrawal, on May 17, 2021, for the reasons set forth in this Complaint, of the conditional consent it had previously granted to such agencies to conduct a three successive day CWA Section 402 and 404-related inspection of its ranch during the period May 18–20, 2021.  This emergency preliminary injunction shall remain in effect until the Defendant agencies adequately respond to

the Plaintiff's previously filed Freedom of Information Act ("FOIA") requests by providing it with information, including aerial and ground photographs, maps and other images capable of enabling the Plaintiff and its representatives to identify the specific physical areas on its properties where the Plaintiff has been alleged to have committed potential CWA 404 and 402 violations.

130.   The Plaintiff, including its owners and employees, will suffer irreparable harm in the absence of preliminary injunctive relief.

131.   The Plaintiff, including its owners and employees, will likely succeed on their unreasonable search and seizure and due process claims under the Fourth and Fifth Amendments to the Constitution.

132.   The balance of the equities tip in the Plaintiff's favor considering that the Plaintiff has no other adequate remedy at law to redress its constitutional deprivations other than the immediate equitable injunctive relief herein sought.

133.   An injunction is in the public interest because the Defendant federal agencies have engaged in a series of arbitrary and capricious acts against the Plaintiff, including its owners and employees, that deprive them of their fundamental liberty interests, including real property, and, thus, betray the trust that they, like all Americans, continue to place in the Founders' vision of a limited government By the People and For the People.

## COUNT V –
## DECLARATORY RELIEF

134.   The Plaintiff hereby re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs.

135.   "Pursuant to the Federal Declaratory Judgment Act, '[i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.'" *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, Case No. 3:09-cv-478 (D. Nev. July 8, 2013), Slip op. at 4 (quoting 28 U.S.C. § 2201(a)).

136.    "'Declaratory relief is designed to resolve uncertainties that may result in future litigation.  It operates prospectively and is not intended to redress past wrongs.'" *League to Save Lake Tahoe*, Slip op. at 4 (quoting *Jaynes Corp. v. Am. Safety Indem. Co.*, Case No. 2:10-cv-00764 (D. Nev. Dec. 26, 2012)).

137.    The Plaintiff hereby seeks a declaratory judgment from this Court finding that the conditional consent the Plaintiff had previously granted to the Defendant agencies to convene the onsite inspection of its approximately 800-acre ranch located in Bruneau, Idaho that is scheduled for the three-day period of May 18–20, 2021, has since been withdrawn, as a matter of law, via the letters the Plaintiff dispatched to the Defendant agencies dated, May 17, 2021 for the reasons stated therein and in this Complaint, and that such withdrawal of consent is immediately legally enforceable.

138.    The Defendant agencies have long employed the accusatory terms "potential violation" and "potential unauthorized activity" in the compliance letters/notices they send to members of the regulated public, including the Plaintiff, alleging the possibility of Clean Water Act noncompliance.  The use of such loaded terminology, however, has encouraged state water resource agencies, such as in California and Arizona, to do the same, which has created significant confusion among the recipients of such letters given the uncertainty surrounding the legal significance of those terms.  For example, the EPA website page entitled, "Section 404 of the Clean Water Act – How Enforcement Actions Protect Wetlands Under CWA Section 404,"

explains *inter alia* how "[r]eports of potential violations from other agencies or communities are added to our enforcement tracking system and case files are prepared for potential enforcement actions."  And, the 947-page USEPA "Interim Revised NPDES Inspection Manual" employs the term "potential violation" on pages 53, 99, 873, and 875.  Similarly, the Corps Sacramento District Office website, among others, discusses how to report "a Potential Unauthorized Activity via the completion of a "Potential Unauthorized Activity Sheet," which can be emailed to its regulatory office or local district offices.

139.     The terms "potential violation" and "potential unauthorized activities", however, do not appear anywhere within the Clean Water Act statute, including CWA §§ 402 and 404 (33 U.S.C. §§ 1342, 1344); nor do they appear within the applicable Corps CWA § 404 implementing regulations (33 CFR § 326.3 (rev. 7-1-11)).  The Defendant Corps regulations, instead, direct the Corps District Engineer to encourage members of the public to report "suspected violations," but without defining the phrase "suspected violation," the threshold of evidence required to establish a credible suspicion of violation, and without comparing the phrases "suspected violation," "potential violation," and "potential unauthorized activity."  Yet, the EPA continues to employ the undefined regulatory term "suspected violation" on its website entitled, "Report Environmental Violations."

140.     When a Corps District Office or an EPA Regional Office launches a CWA § 402 or 404 noncompliance investigation upon a subject property without first having secured scientific and legal proof sufficient to establish objectively reasonable grounds – i.e., a "reasonable suspicion" that an actual or likely CWA 402 or 404 violation has been or will be found that meets the federal wetland or point source jurisdictional standards, such practice unfairly compels a conscientious landowner to devote time and resources and to incur significant expenditures

necessary to rebut the scientifically unsubstantiated allegations and to promptly bring the administrative investigation to a close.  Such accusatory terminology also creates the presumption of guilt rather than innocence.

141.    The Plaintiff hereby seeks a declaratory judgment from this Court finding that the practice of the Defendant agencies of directly and indirectly employing the terms "potential violation" and "potential unauthorized activity" with respect to their enforcement activities related to the Plaintiff and other landowners have been, are and remain per se illegal under the CWA and applicable CWA-implementing Corps and EPA regulations, and that such agencies shall immediately cease and desist from their practice across the nation of employing such terminology to avoid causing any further uncertainty and confusion regarding the meaning of those terms.

142.    The Plaintiff  hereby seeks a declaratory judgment requiring, based on such prior finding, the Defendant agencies to immediately promulgate national regulations pursuant to the applicable Administrative Procedure Act public notice and comment process that define the term "suspected violation" currently set forth in 33 CFR § 326.3, and informally employed by the Defendant EPA on its various agency websites, and set forth the threshold of evidence that must be satisfied before the term "suspected violation" may be employed with respect to a specific activity or party.

143.    The Plaintiff hereby seeks a declaratory judgment finding that the Defendant agencies' current practice of soliciting and receiving anonymous reports or tips of "suspected violations," as that term is used in Corps regulations and Corps and EPA forms and/or webpages, is deficient as a matter of law, to the extent agency personnel fail to undertake an adequate due diligence that evaluates the credibility of the source of the anonymous report or tip of a "suspected violation, as well as, the scientific credibility of the report or tip, itself, and immediately directing

**COMPLAINT - 49**
30417.001\4850-0816-5866.v3

the Defendant agencies, at the national and regional levels, to coordinate among themselves and with one another for the purpose of promulgating intra-agency guidance setting forth standards upon which agency personnel must rely in performing such due diligence.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Ace Black Ranches, LLP, respectfully requests that this Court order the following relief:

1.      Emergency preliminary injunctive relief prohibiting the Defendant agencies and their personnel from entering any portion of the Plaintiff's approximately 800-acre ranch located in Bruneau, Idaho, either by land or watercourse, unless and until the Defendant agencies adequately respond to the Plaintiff's previously filed Freedom of Information Act requests by providing it with information, including aerial and ground photographs, maps and other images capable of enabling the Plaintiff and its representatives to identify the specific physical areas on its properties where the Plaintiff has been alleged to have committed potential CWA 404 and 402 violations;

2.      Declaratory relief finding that the conditional consent the Plaintiff had previously granted to the Defendant agencies to convene the onsite inspection of its approximately 800-acre ranch located in Bruneau, Idaho that is scheduled for the three-day period of May 18-20, 2021, has since been withdrawn, as a matter of law, via the  letters the Plaintiff dispatched to the Defendant agencies dated, May 17, 2021 for the reasons stated therein and in this Complaint, and that such withdrawal of consent is immediately legally enforceable;

3.      Declaratory relief finding that the practice of the Defendant agencies of directly and indirectly employing the terms "potential violation" and "potential unauthorized activity" with respect to their enforcement activities related to the Plaintiff and other landowners have been, are

and remain per se illegal under the Clean Water Act and applicable CWA-implementing Corps and EPA regulations, and that such agencies shall immediately cease and desist from their practice across the nation of employing such terminology  to avoid causing any further uncertainty and confusion regarding the meaning of those terms;

4.      Declaratory relief requiring, based on such prior finding, the Defendant agencies to immediately promulgate national regulations pursuant to the applicable Administrative Procedure Act public notice and comment process that define the term "suspected violation" currently set forth in 33 CFR § 326.3, and informally employed by the Defendant EPA on its various agency websites, and set forth the threshold of evidence that must be satisfied before the term "suspected violation" may be employed with respect to a specific activity or party;

5.      Declaratory relief finding that the Defendant agencies' current practice of soliciting and receiving anonymous reports or tips of "suspected violations," as that term is used in Corps regulations and Corps and EPA forms and/or webpages, is deficient as a matter of law, to the extent agency personnel fail to undertake an adequate due diligence that evaluates the credibility of the source of the anonymous report or tip of a "suspected violation, as well as, the scientific credibility of the report or tip, itself, and immediately directing the Defendant agencies, at the national and regional levels, based on such finding, to coordinate among themselves and with one another for the purpose of promulgating intra-agency guidance setting forth standards upon which agency personnel must rely in performing such due diligence;

6.      Monetary relief consisting of an award of all the Plaintiff's costs, attorney and consultant fees, and disbursements in this action;

7.      Such other relief as the Court may deem just and proper.

DATED THIS 17th day of May, 2021.

PARSONS BEHLE & LATIMER

By: */s/ Norman M. Semanko*_____
      Norman M. Semanko

THE KOGAN LAW GROUP, P.C.

By: /s/ *Lawrence A. Kogan*_____
LAWRENCE A. KOGAN
*Pro Hac Vice Application Pending*

Attorneys for Plaintiff Ace Black Ranches, LLP